**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| **VALERINE LANS ANDERSON,** | ) | |
| **Individually and as administrator of** | ) | |
| **the ESTATE OF DEVON ANDERSON** | ) | |
| **Plaintiffs,** | ) | **CIVIL ACTION CASE NO.:** |
| **v.** | ) | |
| **THE CITY OF ATLANTA** | ) | |
| **CHIEF DARIN SCHIERBAUM** | ) | |
| **MELVIN POTTER** | ) | |
| **LAKESHIA RILEY** | ) | |
| **Defendants.** | | |

# COMPLAINT

1.

VALERINE LANSANDERSON brings this lawsuit and complaint on behalf of herself, her family and on behalf of the Estate of her late son DEVON ANDERSON against the City of Atlanta, Georgia due to the actions and inactions of the City's division the Atlanta Police Department, Officer Melvin Potter of the Atlanta Police Department (APD), APD Chief Darin Schierbaum, and Lakeshia Riley, for the unnecessary and unjustified shooting death of DEVON ANDERSON, who was unarmed and shot and killed in a parking lot by Melvin Potter on August 5, 2024.

## JURISDICTION

2.

This claim arises under 42 U.S.C. § 1983 for violations of the Fourth and Fourteenth Amendments to the Constitution of the United States and for violations of Georgia law.

3.

The Court has subject matter jurisdiction over Plaintiffs' federal claims under 28 U.S.C. §§ 1331 and 1343 and supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

## VENUE

4.

The events giving rise to Plaintiffs' claims occurred within the jurisdictional and geographic boundaries located within the Northern District of Georgia. Defendants are residents of Fulton County, Georgia. Venue is proper in the Northern District of Georgia.

## PARTIES

5.

VALERINE LANS ANDERSON is the bereaved mother of DEVON ANDERSON. DEVON ANDERSON was unmarried and without children

at the time of his death. The Estate of DEVON ANDERSON is represented by VALERINE LANS ANDERSON, who is also the mother of DEVON ANDERSON. VALERINE LANS ANDERSON is anticipated to be appointed as Administrator of DEVON ANDERSON's Estate in due course.

6.

Defendant City of Atlanta is a body corporate, organized and established as a municipality by operation of the laws of the State of Georgia and is subject to this lawsuit. Plaintiffs provided timely ante litem notice of their claims to the City of Atlanta on or about January 30, 2025. The City of Atlanta did not respond in writing or otherwise to the Notice.

7.

The City of Atlanta may be served with this Complaint by service upon Mayor Andre Dickins at 55 Trinity Avenue SW, Atlanta, Georgia 30303. Atlanta Police Department (or "APD") is a division of the City of Atlanta and APD is used interchangeably throughout this Complaint to refer to the City of Atlanta and its division APD.

8.

At all times material hereto, Darin Schierbaum was the Chief of Police for the City of Atlanta's Police Department and was acting in his capacity as the final policymaker for the City with regard to its performance of police functions. Chief Schierbaum was supervisor over APD Officers at all times relevant to this action. Upon information and belief, Chief Schierbaum is currently the Chief of Police of the City of Atlanta's Police Department. When service is made upon Chief Schierbaum as required by law, he will be subject to the jurisdiction of this Court.

9.

Melvin Potter is an individual who, at all times pertinent to the events giving rise to this lawsuit, was a City of Atlanta Police Department (APD) Officer, and was acting under color of law.

10.

Melvin Potter is sued in his individual capacity and official capacities. Melvin Potter remains, at present, employed by APD and may be served at his place of employment or otherwise.

11.

Lakeshia Riley is an individual citizen of Georgia and may be served at her place of residence or otherwise.

**APD OFFICER MELVIN POTTER UNJUSTIFIABLY SHOOTS DEVON ANDERSON TO DEATH**

12.

On the evening of August 5, 2024, DEVON ANDERSON was lawfully in the parking lot of Harold's Chicken and Ice Bar and Nikki's Smoking Room located at 5495 Old National Hwy, in South Fulton.

13.

ANDERSON was present while Lakeshia Riley and APD Officer Melvin Potter argued with others at 5495 Old National Hwy, in South Fulton. Lakeshia Riely sought to drive under the influence of alcohol and others present attempted to prevent Riley from driving away.

14.

APD Officer Potter used his police authority to determine Ruley could drive, despite her inebriation. APD Officer Potter was also inebriated, and used his police authority to berate others who attempted to prevent Riley from driving.

15.

Lakeshia Riley was hired as a security provider at Nikki's Smoking Room, and frequently invited APD Officers to be present at the venue, to assist with security at the venue, and to maintain a visible presence at the venue.

16.

APD Officer Melvin Potter was with Lakeshia Riley on the night in question, as well as other APD Officers, and assisted with security at the venue.

17.

The presence of APD Officers at the venue helped Lakeshia Riley maintain order at the venue.

18.

On the night of August 5, 2024, APD Officer Melvin Potter was drinking alcohol and using illicit substances, and had his APD issued badge on his person while doing so. APD Officer Potter was also wearing a t shirt with a five-pointed star, a prominent and significant symbol in American law enforcement representing authority, and is commonly known as the Marshal's badge symbol or Sheriff's Star.

19.

While at the venue, APD Officer Melvin Potter displayed his APD badge, told patrons and staff he was observing them as an officer of the law, stayed within close proximity to other law enforcement officers and individuals wearing security vests, threatened to "put hands on" (which is police jargon) patrons and threatened to throw patrons out and arrest patrons who acted in ways he disliked and or who staff asked for assistance controlling.

20.

APD Officer Potter believed his status as an APD Officer made him "above the law" and not subject to the rules of civil society and openly stated he had the power to harm people.

21.

In conjunction with Lakeshia Riley, Officer Potter engaged in illegal activities for self-gain, notoriety, self-promotion, and self-interest

.

22.

On the night of August 5, 2024, APD Officer Potter's arrogant commentary and actions instigated an argument in the parking lot at 5495 Old National Hwy, in South Fulton.

23.

ANDERSON attempted to defuse this argument.

24.

APD Officer Potter reacted to ANDERSON's attempted assistance by invoking his APD authority.

25.

At approximately 1:16 am, Atlanta Police Officer Melvin Potter shot and killed ANDERSON.

26.

ANDERSON was unarmed and never a threat to Potter or anyone else.

27.

APD Officer Melvin Potter was under the influence of alcohol and other substances and used a firearm authorized by APD.

28.

APD Officer Melvin Potter acted under color of law in using his APD firearm, flashing his badge, invoking his police authority.

29.

APD Officer Potter was in his vehicle, driving under the influence of alcohol and other illegal substances at the time he fired his APD firearm at ANDERSON, an innocent pedestrian.

30.

APD entrusted Officer Melvin Potter to have and use his firearm despite previous drunk driving and other concerning behaviors.

**MELVIN POTTER'S DISTURBING HISTORY ALLOWED, ENCOURAGED & ACCEPTED BY APD**

31.

Officer Melvin Potter has a troubling, checkered history, and propensity for off-duty drunken violent behavior which went largely unchecked by the Atlanta Police Department.

32.

All Defendants knew or should have known that APD Officer Potter was a "loose cannon" with an uncontrollable temper, who routinely

engaged in acts of violence and repeatedly violated the policies, rules, and regulations of APD, including the use of firearms, force, violence, deadly force, vehicles, alcohol, and illicit substances.

33.

All Defendants were aware or should have been aware of numerous instances of APD Officer Potter's abnormal conduct that were at odds with and unbecoming of the professional demeanor and standards of APD.

34.

Office Potter's conduct was extreme and outrageous and exhibited reckless indifference to the consequences and interests of Plaintiffs' Decedent and was committed willfully and wantonly, maliciously, deliberately, and intentionally, and in such an egregious manner as to shock the conscience and was beyond all possible bounds of decency and must be regarded as atrocious and utterly intolerable in a civilized community.

35.

All Defendants either explicitly or tacitly sanctioned the previous misconduct of APD Officer Potter through ignoring guidelines, practices, rules and or procedures and or had in effect same that were in violation of national standards and the rights guaranteed to individuals under the laws of the US Constitution.

36.

For example, in 2017 APD Officer Potter victimized his pregnant domestic partner in an episode of domestic violence.

37.

Despite that APD Officer Potter was deceptive during his internal affairs interview about this incident, APD acted inadequately in correcting the behavior of and or dissuading APD Officer Potter from further acts which violate civil rules of society and individual's civil rights. See:

https://shieldsofshame.com/melvin-potter-and-iscah-njoku-interview-breakdown/

38.

During Officer Potter's domestic abuse incident in 2017, Potter physically ripped his estranged girlfriend Officer Njoku's shirt exposing

her breast, picked Njoku (who was pregnant) up, carried her, and threw her from his apartment causing her to fall to the concrete ground where she hit her head on the concrete. Potter was also observed choking Njoku. Officer Potter admitted slamming his front apartment door on Njoku and pinning his pregnant girlfriend with the front door but claimed that Njoku fell down some stairs. Computer voice stress analysis revealed deception in Potter's story. On another occasion Officer Potter pushed Njoku up against a wall and placed his hands around her throat, and punched a wall. Despite more than sufficient proof of criminal battery, Officer Potter received no adequate discipline following this conduct, fortifying his belief he was "above the law".

39.

Following the domestic violence incident, there was reasonable suspicion that Officer Potter was abusing substances in violation of the City of Atlanta, State of Georgia and or departmental directive, rules or regulations regarding the use, possession and or sale of any such substances.

40.

However, the inadequate supervision of Officer Potter's behavior was ineffective in curbing Potter's substance abuse.

41.

In 2021, Officer Potter was arrested for driving under the influence of substances (DUI).

42.

Upon being pulled over for driving in excess of 100 miles per hour in Coweta County, Officer Potter attempted to use his police credentials to thwart his imminent arrest, stating "we are on the same team" and providing his Atlanta Police identification to the arresting officer. In the arresting officer's Body Worn Camera surveillance footage Officer Potter's firearm can be seen on the passenger seat, which Potter attempted to hide under a sweatshirt. Officer Potter refused to take a breathalyzer and refused to submit to sobriety examination during his DUI arrest. Potter's verbally identifying himself as a police officer and presentation of his APD ID card during his arrest was for purposes of evading accountability for violating the law. This indicates Potter believed his status as an officer of

the law made him "above the law" and shielded him from consequences for violating the law.

43.

APD Officer Potter was charged with and convicted for driving under the influence of alcohol or while intoxicated; Potter has reported substance abuse problems; and has been the subject of citizen complaints, yet Potter remained employed, retained police privileges, and was inadequately supervised and or inadequately disciplined. See:

- https://www.youtube.com/watch?v=GvdiOnpDO-Y
- https://www.11alive.com/article/news/local/mother-demands-justice-off-duty-apd-officer-shot-killed-her-son-despite-not-being-charged-for-it/85-b657868f-3f1a-4143-a8ec-99d5d9c5fe34
- https://www.ajc.com/news/crime/atlanta-officer-arrested-after-fatal-shooting-in-south-fulton/3P7O4UO76FFSJNPV3ID6AHNG6I/

44.

Officer Potter learned no lesson from the inadequate discipline and supervision from his previous incidents other that he could get away with violating the law and decency. Officer Potter's "above the law" behavior continued unabated and led to and resulted in DEVON ANDERSON's

death, as Officer Potter also refused to submit to substance testing after the shooting of ANDERSON, violating a court ordered warrant. See:

- https://www.atlantanewsfirst.com/2024/10/12/south-fulton-police-looking-hire-officers-who-can-draw-blood-after-dispute-with-grady-memorial-hospital/

45.

At the scene of the shooting of ANDERSON, Officer Potter was with other officers of the law, all of whom were known to be officers of the law, and Officer Potter attempted to use his police authority to cover-up the wrongfulness of the killing. Potter's attempts to mislead investigators were aided and or tacitly approved by other officers of the law.

**OFFICER POTTER ACTED UNDER THE COLOR OF LAW**

46.

Considering Officer Potter's belief that he is "above the law", his use of his police officer status for purposes of evading accountability and lording power, including as security at the bar and in determining Riley should drive despite others' protestations, his using his badge and star to invoke police authority, his refusal to submit to substance testing while abusing

substances, all of the above including Potter's use of his service firearm to kill ANDERSON constitute action taken under the color of law.

47.

A person acts under color of state law when he acts with authority possessed by virtue of his employment with the state, and this includes misuse of power made possible only because the employee is clothed with the authority of state law. See *Burrell v. Board of Trustees*, 970 F.2d 785, 790 n. 12 (11th Cir.1992), cert. denied, 507 U.S. 1018, 113 S.Ct. 1814, 123 L.Ed.2d 445 (1993); and *Bennett v. Pippin*, 74 F.3d 578, 589 (5th Cir.1996) (concluding rape of criminal suspect by sheriff was under color of state law when rape victim knew sheriff was investigating her case and where sheriff overcame her resistance by intimidation linked to his authority: "I can do what I want, I'm the sheriff'), cert. denied, 117 S.Ct. 68, 136 L.Ed.2d 29 (1996).

48.

The mere fact that an officer is off duty and out of uniform does not resolve the color-of-state-law issue. "[T]he lack of outward indicia suggestive of state authority - such as being on duty, wearing a uniform, or driving a patrol car - are not alone determinative of whether a police officer is acting under color of state law." *Revene v. Charles County Commissioners*,

882 F.2d 870, 872 (4th Cir.1989). Rather, the analysis is "intensely fact-specific." *Ott v. City of Mobile*, 169 F. Supp. 2d 1301 - Dist. Court, SD Alabama 2001.

49.

Appellate courts have considered a number of factors in assessing whether an off duty, plainclothes officer acted under color of state law. Among these factors are the officer's flashing of a badge, his display or use of a department-issued weapon, his verbal identification of himself as a police officer, and his arrest of the plaintiff. *Id*. In *Ott*, there was evidence that the officer displayed his badge, drew and used his service firearm, and verbally identified himself as a police officer. In addition, the officer in the *Ott* case made statements that he was a police officer and could do whatever he wanted – these acts are consistent with action taken under color of state law. See *Ott*, at 1309 citing *United States v. Tarpley*, 945 F.2d 806, 808, 809 (5th Cir.1991) (the defendant's statement to the plaintiff that he could kill him and get away with it because he was a cop supported a finding that he acted under color of state law because, through these statements, the defendant "claimed to have special authority for his actions

by virtue of his official status" and also utilized fellow officers as allies), cert. denied, 504 U.S. 917, 112 S.Ct. 1960, 118 L.Ed.2d 562 (1992).

50.

An officer-civil-defendant acts under color of state law when he exercises power "possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *West v. Atkins*, 487 U.S. 42, 49-50, 108 S.Ct. 2250, 2255-56, 101 L.Ed.2d 40 (1988) ("It is firmly established that a defendant in a § 1983 suit acts under color of state law when he abuses the position given to him by the State"); *Morgan v. Tice*, 862 F.2d 1495, 1499 (11th Cir.), cert. denied, 493 U.S. 813, 110 S.Ct. 61, 107 L.Ed.2d 28 (1989). See also *Daigle v. City of Portsmouth*, 129 N.H. 561, 534 A.2d 689, 699-701 (N.H.1987) (police officer who assaulted a theft suspect while officer was off duty acted in the scope of his employment); *Cheatham v. City of New Orleans*, 378 So.2d 369 (1979) (off duty police officers who were drinking and shot and killed an unarmed civilian who had intervened in an altercation between the police officers and a shoeshine boy were acting in the scope of their employment).

## POTTER VIOLATED LEOSA - APD INDIFFERENT TO VIOLATION

51.

Officer Potter was acting under color of law and was also drinking alcohol and using illegal drugs (Potter refused blood draws and a witness said Potter seemed intoxicated at the time of the shooting).

52.

The Law Enforcement Officers Safety Act (LEOSA) prohibits the use of alcohol or other intoxicating substances while carrying a firearm, a simple directive. In addition to being unconstitutional, Officer Potter's actions were ministerial violations.

53.

In the fall of 1996, with the passage of Title 18, United States Code, Section 922(g)(9) (the Lautenberg Amendment) regarding the "Gun Ban for Individuals of a Misdemeanor Crime of Domestic Violence", the Criminal Division to the United States Attorneys' Offices stated:

> The 1968 Gun Control Act, and subsequent amendments codified at 18 U.S.C. § 921 et seq., prohibit anyone convicted of a felony and anyone subject to a domestic violence protective order from possessing a firearm. The intended effect of this legislation is to extend the firearms ban to anyone convicted of a "misdemeanor crime of domestic violence."

This bill passed with almost unanimous support and represents Congress's recognition that "anyone who attempts or threatens violence against a loved one has demonstrated that he or she poses an unacceptable risk, and should be prohibited from possessing firearms." Congressional Record, p. S11878, September 30, 1996. This new provision affects law enforcement in three interrelated ways. First, it will assist in preventing those individuals who have demonstrated a propensity for domestic violence from obtaining a firearm.

Second, it will assist law enforcement by providing a tool for the removal of firearms from certain explosive domestic situations thus decreasing the possibility of deadly violence.

Finally, it will serve as a federal prosecution tool in certain situations where alternatives have failed.

See:

https://www.justice.gov/jm/jm-9-60000-protection-individual#9-60.1100

54.

The Act held that:

There is no law enforcement exception: One of the provisions of this new statute removed the exemption that 18 U.S.C. § 925(a)(1) provided to police and military. Thus, as of the effective date (1996), any member of the military or any police officer who has a qualifying misdemeanor conviction is no longer able to possess a firearm, even while on duty . . . .

55.

Atlanta Police Department knew Potter had previous DUI, substance abuse and domestic violence incidents but downplayed or ignored those serious problems.

56.

Atlanta Police Department's tolerance of Potter's misbehavior and decision to continue to retain him, entrust him with authority, a badge and a weapon, and failure to adequately investigate, supervise and forestall further incidents emboldened Potter to continue misbehaving and it is logical to conclude official tolerance of repeated red-flags and misconduct bespeak deliberate indifference and facilitated similar unlawful misconduct in the future.

57.

Atlanta Police Department had a custom and policy of failing to train, supervise, and discipline drunken off duty officers maintaining their service firearms on their persons and indicia of authority including wearing police vests and misusing authority while intoxicated. Atlanta Police Department had a custom and policy of retaining and entrusting unsuitable officers and failing to have an adequate early warning system in

place and a custom of turning a blind eye to the deeply troubling behavior of officers such as Potter instead of disciplining, counseling, training, and supervising officers appropriately, especially those like Potter who commit misconduct while off-duty, and an attendant code of silence, all of which encourages officers to engage in misconduct under color of law with impunity and without the fear of official consequences. Atlanta Police Department should have foreseen that Officer Potter would unleash his loose cannon tendencies and wholly despicable and wrongful belief that he was "above the law" and could act with impunity upon innocent citizenry.

58.

Officer Potter was a member of the Atlanta Proactive Enforcement & Interdiction (APEX) squad. "APEX" refers to a specific unit within APD's Special Enforcement Section. This unit focuses on aggressive enforcement of gang and gun laws. The APEX Unit replaced the disbanded Red Dog Unit, and APEX has since been disbanded and replaced by the Titan Unit. These units are intentionally "aggressive" and brutal in their tactics and officers in these units require training and supervision to ensure the brutality and aggression utilized in enforcing laws is properly employed.

59.

According to Georgia Bureau of Investigation (GBI) Director, Office of Public & Governmental Affairs Nelly Miles, Officer Melvin Potter shot and killed ANDERSON. GBI's press release may be found at the following link:

- https://gbi.georgia.gov/press-releases/2024-08-05/gbi-investigates-shooting-death-involving-duty-atlanta-police-officer

60.

Specifically, GBI's press release states:

> The investigation shows on August 5, 2024, at about 1:00 a.m., Melvin Potter, age 30, an off-duty Atlanta Police Department officer, was at a bar with two other people at the 5000 block of Old National Highway in College Park, GA. As Potter was leaving the bar, he was escorting someone to their car when an argument occurred between him and another group of people. Later, the incident escalated, and Potter ended up shooting and killing Anderson.

. . . . . .

61.

Based on these facts as reported by GBI, Officer Potter obviously and indisputably used excessive force.

62.

In actuality, the circumstances recited by GBI are far worse as ANDERSON was unarmed and attempting to de-escalate an argument, an

argument *caused and instigated* by Officer Potter, a loose cannon, unable to control his temper, and prone to violence.

63.

Officer Potter's "escort" was an act of police authority and was under color of law.

64.

Officer Potter was never in any danger. Officer Potter was in his red BMW vehicle when he shot and killed ANDERSON.

65.

Officer Potter incited the argument, an argument he won using his police authority to enable his friend to violate the law and drive drunk, and then used wholly unnecessary and excessive force, and upon shooting ANDERSON crashed his own car into a curb, which he was also operating under the influence. Thereafter Potter attempted to cover up his crimes.

66.

According to news reports of the incident, see:

- https://www.wsbtv.com/news/local/south-fulton-county/family-man-killed-by-off-duty-apd-officer-birthday-wants-know-why-he-hasnt-been-charged/MHLZ3RUOUZFIXDMLUHGXJJ4YKA/

- https://www.wsbtv.com/news/local/apd-off-duty-officer-arrested-after-man-shot-death-outside-bar-during-birthday-party/WBVSX6GBENBI7PMKPLEKCOKZBY/

Potter started an argument with a group of people while escorting a South Fulton police officer to her car. A witness told Channel 2 Action News that ANDERSON was trying to de-escalate the argument when Potter shot him. Upon information and belief, the individual being escorted to her car was Lakeshia Riley.

67.

Riley had Officer Potter provide a police escort to her car and in conjunction with Officer Potter, decided to injure and or kill ANDERSON.

68.

Officer Potter was arrested and booked at the Fulton County Jail after he refused to allow administration of a court ordered blood alcohol test.

69.

ANDERSON was shot multiple times, grievously injured, and then taken to a local hospital where he was pronounced dead.

## APD OFFICER ALCOHOL ABUSE, VEHICLE USE, & POOR SUPERVISION

70.

APD declined to engage in sufficient remedial steps despite a number of instances involving alcohol abuse during operation of vehicles by its officers in violation of law and APD's rules.

71.

APD's failure to enforce rules emboldens its officers to act irresponsibly and creates a culture of misbehavior and recklessness.

72.

In 2012, APD Officer Niezurawski served 10 days in jail and 12 months on probation after pleading guilty to DUI. That charge stemmed from an April, 2012 incident where APD Officer Niezurawski was allegedly driving drunk and on the wrong side of Interstate 85. APD Officer Niezurawski collided with a Greyhound bus that was traveling in the proper direction. APD Officer Niezurawski was Off-Duty at the time the incident.

73.

APD declined to engage in, and or, engaged in inadequate remedial steps regarding this incident.

74.

On August 7, 2014, APD Officer Christopher Niezurawski was again arrested by the Georgia State Patrol at Piedmont and Lenox roads. APD Officer Niezurawski was charged with driving under the influence.

75.

APD Officer Niezurawski was Off-Duty at the time of both incidents.

76.

APD engaged in inadequate remedial steps regarding these incidents.

77.

On September 3, 2014 Atlanta Police Supervisor Robert Joseph Albertini was stopped by a Cobb County officer who spotted the Atlanta Police supervisor weaving back and forth over a double yellow line.

78.

APD Supervisor Albertini refused Field Sobriety Test and was jailed at the Cobb County Jail on suspicion of DUI.

79.

According to a Fox Atlanta news article, the incident took place on a road in Kennesaw, outside of APD's jurisdiction.

80.

APD declined to engage in, and or, engaged in inadequate remedial steps regarding this incident.

81.

On November 14, 2014, Officer Adam Lee was already on suspension from the Atlanta Police Department when he was arrested for drunk driving.

82.

According to WSB-TV, a Georgia State Patrol officer spotted a car driven by APD Officer Adam Lee speeding down Interstate 85 near 17th Street at speeds in excess of 100 mph in a 55 mph zone. When APD Officer Lee was pulled over, he was given a breath test and allegedly blew a 0.186, twice the legal limit.

83.

APD Officer Lee allegedly asked the officer if he would turn off the patrol car's dash camera, a request the officer refused. The officer then

noticed APD Officer Lee was wearing an Atlanta Police Department ID card. APD Officer Lee told the officer he was on suspension for allegedly drinking on the job.

84.

APD declined to engage in, and or, engaged in inadequate remedial steps regarding this incident.

85.

On December 23, 2016 an Atlanta Police Officer was arrested for driving under the influence after police found him slumped over the wheel of a vehicle and passed out. Media outlets report the incident occurred early Sunday in Powder Springs. According to a Cobb County police report, an officer arrived at the scene to help another officer who found a vehicle on a curb. Police then found 31-year-old APD Officer Theodore Travis slumped over the wheel, passed out.

86.

APD declined to engage in, and or, engaged in inadequate remedial steps regarding this incident.

87.

On February 10, 2017 Atlanta Police confirmed APD Officer Sherrick Morrison was charged with DUI. According to a report from the Georgia State Patrol, APD Officer Morrison was driving a Nissan Altima when he hit a car on Interstate 285. Atlanta Police confirmed Georgia State Patrol arrested Atlanta Police Officer Sherrick Morrison on charges of DUI, following too closely, and hit and run/leaving the scene of an accident and refusing sobriety testing.

88.

APD declined to engage in, and or, engaged in inadequate remedial steps regarding this incident.

89.

August 2017 Atlanta Police Officer Dennis Castro was arrested for DUI at Piedmont Road and Morosgo Drive after running a red light.

90.

APD declined to engage in, and or, engaged in inadequate remedial steps regarding this incident.

91.

On May 5, 2022, APD Officer Robert Malone, who is white and worked for the Atlanta Police Department engaged in road rage racially based harassment, cruelty to children, and assault with a deadly weapon while wearing an APD badge. APD Officer Malone was Off-Duty but in uniform at the time, according to a police spokesperson referred to in a media report. APD Officer Malone honked his horn, yelled a racial slur and said he would "blow [a woman's] brains out," according to a media report. The woman and her children, who were also in the car, saw the driver point a gun at them through his windshield, according to the report.

92.

APD declined to engage in, and or, engaged in inadequate remedial steps regarding this incident.

93.

On August 30, 2022 around 5:30 pm state troopers responded to a report of a single-vehicle crash along SR 166 in southwest Atlanta. This crash was caused by APD Officer Carlos Thomas. The responding state trooper noted that APD Officer Thomas refused to comply with a field sobriety test and declined to take a breathalyzer. The state trooper also

stated that Thomas "appeared confused." "I asked Mr. Thomas where he was coming from, to which he said he didn't know," the state trooper wrote in his report. "I then asked him where he was going to which he stated he thought he was going to pick up his child."

94.

APD Officer Thomas declined to answer state troopers when asked how many alcoholic beverages he had consumed. "He stated that he was going through some stuff," the state trooper stated in his report.

95.

At the time of the alcohol induce car crash, APD Officer Thomas was a seven year veteran of the Atlanta Police Department and member of the Atlanta Proactive Enforcement & Interdiction (APEX) squad.

96.

APD declined to engage in, and or, engaged in inadequate remedial steps regarding this incident.

97.

On March 20, 2023 an Atlanta Police Lieutenant was charged with driving under the influence in Paulding County. According to Georgia

State Patrol, Atlanta Police Lt. Renato Anaya's SUV was found crashed off the roadway along Macland Road near Mount Tabor Church Road just after midnight on a Sunday morning.

98.

A state trooper who responded said "he could smell alcohol on Anaya's breath," and inside the vehicle the state trooper spotted an open Modelo beer and Atlanta Police issued gear.

99.

APD Lt. Ayana was taken to Wellstar Paulding where GSP said he agreed to a blood test. But when the trooper went to retrieve his "blood draw kit", nurses reported APD Lt. Ayana fled the hospital.

100.

Cobb County K-9's, along with the Paulding County Sheriff's Office, were called in to help find APD Lt. Anaya.

101.

Eventually, a Hiram officer found APD Lt. Anaya at a RaceTrac across the street from the hospital.

102.

APD Lt. Ayana was also charged with failure to maintain a lane and open container.

103.

APD declined to engage in, and or, engaged in inadequate remedial steps regarding this incident.

104.

Knowing that APD tolerated drunk driving, evasion of substance testing, illegal operation of vehicles, and unlawful use of firearms indicated to Officer Potter that he could do the same with impunity and without repercussion and consequences.

## APD'S CULTURE OF OFF DUTY OFFICER UNJUSTIFIED VIOLENCE

105.

APD declined to engage in sufficient remedial steps despite a litany of instances involving the use of unreasonable and excessive force by its off duty officers in violation of law and APD's rules.

106.

On September 24, 2016 an Off-Duty Atlanta Police Department officer in plain clothes pulled into the Collier Flats Apartments on 1000 Collier Road NW around 1 a.m. and shot a Hispanic male Pedro Maldonado who had been robbed by an unidentified black male.

107.

APD declined to engage in, and or, engaged in inadequate remedial steps.

108.

On February 25, 2017, City of Atlanta Police Officer Mathieu Cadeau fired his service weapon into a vehicle containing the plaintiffs Noel Hall and Christina Hall while he was Off-Duty conducting a traffic detail in downtown Atlanta, Georgia after a motocross event.

109.

APD Officer Cadeau's disciplinary history showed several use of force incidents and violations of police department policies. This included an incident in which the City of Atlanta had granted a permit for an event and arranged for Off-Duty police officers to provide security.

110.

Officer Cadeau was working Off-Duty and began "grabbing Plaintiff Carr and twisting her arm violently behind her, shoving her head-first into a parked car in the garage, then dragging her backwards, passing Plaintiff Gibson, out onto the street area." Officer Cadeau then told another police officer to arrest Gibson "while continuing to drag Plaintiff Carr to his police vehicle where she was arrested."

111.

Cadeau testified that he was not disciplined as a result of the incident with the Carrs:

Q Am I correct that the fact that you didn't get any disciplinary action as a result of what happened with the Carrs, that you took that to mean that you were doing what you were trained and told to do pursuant to the APD policies and procedures?

A Yes.

112.

The next year, 2014, Officer Cadeau was investigated by APD for the use of excessive force in four separate incidents. In one incident, he pepper-sprayed a detainee in the face who was handcuffed and shackled to a bench in the police precinct.

113.

In another incident, Officer Cadeau deployed his pepper spray after responding to a fight at a bar. Officer Cadeau initially advised his superiors that he had not deployed his pepper spray but recanted once patrons of the bar made statements that they had been pepper-sprayed.

114.

APD designated Officer Cadeau for its Early Warning System in August 2014. This program "establish[es] policies and procedures for identifying employees with a pattern of behavior that may be detrimental to the achievement of the goals and objectives of the Department, and initiate[s] a process for the provision of appropriate corrective action." APD.SOP.2022.

115.

In January 2015, Officer Cadeau's commander recommended that Officer Cadeau be fired. Yet, instead of being fired, Officer Cadeau was subsequently promoted to sergeant.

116.

The City and APD's failure to take remedial steps concerning the misconduct of its officers was not limited to just Officer Cadeau, however.

117.

Jeffrey J. Noble, a former police officer with twenty-eight years of experience who also served as a Deputy Chief of Police prior to retirement opined in one of the Officer Cadeau civil rights actions that the "Atlanta Police Department demonstrated a pattern, practice, or custom of failing to follow their own policies design[ed] to identify officers who engage in serious misconduct."

118.

Files from the Atlanta Citizen Review Board ("ACRB") recommending sustaining complaints of excessive force in nineteen (19) incidents involving officers other than Cadeau prior to August 2015 bear this out.

119.

The ACRB was created in 2007 to "to provide citizen oversight of misconduct accusations against sworn members of the police and corrections departments in the City of Atlanta and to provide a credible,

independent forum where complainants and accusations can be addressed."

120.

The City Chief of the Police Department rejected the recommendations of the ARCB concerning these nineteen (19) incidents.

121.

APD SOP 2300 states that APD's Chief had ultimate authority over disciplinary policies.

122.

APD declined to engage in, and or, engaged in inadequate remedial steps.

123.

Atlanta Police officers Yasin Abdulahad and El Maik Roberson shot and killed 24-year-old Deaundre Phillips during a confrontation outside the Atlanta Public Safety Annex in the 3400 block of Donald Lee Hollowell Parkway in northwest Atlanta on Jan. 26, 2017.

124.

APD declined to engage in, and or, engaged in inadequate remedial steps regarding this incident.

125.

In 2019, Atlanta Police Officer Sung Kim shot and killed Jimmy Atchison who was unarmed and hiding in a closet when he was killed.

126.

APD declined to engage in, and or, engaged in inadequate remedial steps regarding this incident.

127.

APD allowed a former Atlanta police officer to utilize his uniform in a 2019 robbery while wearing his former APD uniform and badge. Justin Mikale Thorne, 26, pleaded guilty to multiple felony charges in the armed robbery of rapper Bankroll Freddie, whose real name is Freddie Gladney III, and another man on Oct. 17, 2019.

128.

APD declined to engage in, and or, engaged in inadequate remedial steps regarding this incident.

129.

On October 6, 2023, Atlanta Police Officer Anthony Anderson was charged with sexual battery after a 16-year-old girl accused him of assaulting her after he responded to a traffic accident involving the girl in early August.

130.

APD declined to engage in, and or, engaged in inadequate remedial steps regarding this incident.

131.

According to APD Officer Anthony Anderson's disciplinary report history, he received at least four citizen complaints since 2018.

132.

APD Officer Oliver Simmonds shot and killed 18-year-old D'ettrick Griffin in 2019. APD Officer Simmonds was Off-Duty and in plain clothes at the time that Griffin entered the officer's car and attempted to drive away. APD Officer Simmonds fired his service weapon into the vehicle as it was moving away from him and no one was in immediate danger.

133.

APD declined to engage in, and or, engaged in inadequate remedial steps regarding this incident.

134.

APD said Officer Simmonds was placed on a "non-enforcement assignment." After learning about the indictment, APD said Simmonds "was relieved from his administrative assignment and suspended without pay."

135.

Less than two weeks after APD Officer Simmonds was indicted, APD said Officer Simmonds was retired from the force.

136.

On or around May 15, 2024, Atlanta Police Officer Koby Minor shot and killed Lyft driver Reginald Folks while Folks was driving Officer Minor. Officer Minor was Off-Duty and was in the back seat of Folks' Lyft vehicle at the time Officer Minor shot Folks in the back of the driver's head.

137.

APD declined to engage in, and or, engaged in inadequate remedial steps regarding this incident.

138.

On October 4, 2024, Atlanta Police Officer / Investigator Aubree Horton was shot and killed while Horton was attempting to break into his neighbor's house in Douglas County.

139.

APD declined to engage in, and or, engaged in inadequate remedial steps regarding this incident.

## APD'S PATTERN & PRACTICE OF UNJUSTIFIED VIOLENCE IS NOT LIMITED ONLY TO OFF DUTY OFFICERS

140.

On the night of June 12, 2020 a Wendy's Restaurant employee called 911 and reported that a person, Rayshard Brooks, was asleep in his vehicle and stopped in the drive-thru lane. Officer Brosnan and Officer Rolfe arrived and after a discussion, the officers discharged their taser, one of the officers' spent tasers was absconded by Brooks, who then began running away from the Officers. Officer Rolfe chased Brooks on foot while holding his taser in his right hand, and Brooks' running out-paced APD Officer Rolfe increasing the distance between himself and the Officers.

141.

As Brooks ran, Officer Rolfe began to unholster his firearm while running after Brooks. As Brooks was running away with his back to the two officers, Brooks turned and discharged the Officer's spent taser and although no one was within range of the taser, and the prongs from the taser did not come close to striking either officer or any other person, and Brooks continued to run away from the Officers, APD Officer Rolfe raised his firearm and fired three shots at Brooks' back.

142.

While Books was on the ground, rather than provide medical assistance for his deadly gunshot wounds, Officer Brosnan placed his foot on top of Brooks' shoulder causing Brooks additional pain.

143.

While Brooks was on the ground, rather than provide medical assistance for his deadly gunshot wounds, Officer Rolfe forcefully kicked Mr. Brooks.

144.

Officers Rolfe and Brosnan made no effort to provide Brooks with any medical attention.

145.

APD declined to engage in, and or, engaged in inadequate remedial steps regarding this incident.

**CITY OF ATLANTA & APD POLICY AND TRAINING RELATED TO THE USE OF DEADLY FORCE**

146.

Officer Potter was trained by the City of Atlanta and APD that deadly force was authorized in response to any "resistance to a lawful arrest."

147.

As Officer Potter believed he had the authority to arrest anyone who disagreed with him despite how inebriated he was, Officer Potter perceived ANDERSON's attempt to calm down an argument initiated by Potter as resistance to Potter.

148.

Officer Potter's shooting and killing of ANDERSON was authorized by City of Atlanta and APD policy and the training Potter received during his employment with the City of Atlanta and APD because, at some point

prior to the shooting, ANDERSON refused to kowtow and resisted Potter's commands and attempted to de-escalate the argument Potter instigated.

149.

One form of training provided by the City and APD is reality-based training in the form of a shooting simulator. In that simulator, officers are presented with scripted scenarios designed to place officers in real-world shoot/don't shoot scenarios. The training provided to officers through those scenarios teach that it is permissible to shoot a suspect if that suspect has resisted arrest, without regard to any continuing imminent danger posed by the suspect.

150.

City and APD policy and training provide that an officer may use deadly force against a suspect if the underlying crime involved the "threatened infliction of serious harm" even if that suspect does not pose an immediate or imminent danger of future harm to any person or officer.

151.

Officer Potter was consciously aware of the training he received from the City of Atlanta and APD which set forth the circumstances in which deadly force was authorized when he shot and killed ANDERSON.

152.

Officer Potter relied on the training he received from the City of Atlanta and APD when determining whether to shoot ANDERSON.

153.

The training received by Officer Potter from the City and APD was the driving force behind his decision to shoot ANDERSON.

## PATTERN OF UNCONSTITUTIONAL APPLICATION OF THE CITY & APD'S DEADLY FORCE POLICY AND TRAINING

154.

The City and APD's custom, policy, and pattern of reckless and unconstitutional supervision, and training related to the use of deadly force by its police officers is further demonstrated through the following examples.

### Maurice Hampton Incident

155.

On June 30, 2011, Officer Thomas Atzert pulled over a vehicle that was being driven by Maurice Hampton. See Brad Schrade & Jennifer Peebles, Unarmed and Shot in the Back, AJC, https://investigations.ajc.com/overtheline/gapolice-shootings/ .

156.

Maurice Hampton subsequently fled from the traffic stop and was pursued by Officer Atzert, who engaged in a physical struggle with Maurice Hampton. Id.

157.

When Maurice Hampton broke away from the struggle and began to run away, Officer Atzert shot him in the back, killing him. Id.

158.

Maurice Hampton did not pose an immediate danger to any person as he fled and the sole basis for the use of force against him was the City's policy and training that the use of deadly force was authorized because Hampton was fleeing.

159.

APD declined to engage in, and or, engaged in inadequate remedial steps regarding this incident.

**Jamarion Robinson Incident**

160.

On August 5, 2016, a task force that included Atlanta Police Officer William Sauls was attempting to arrest Jamarion Robinson for outstanding

warrants. See Catherine Park, U.S. Marshals Task Force Accused of Excessive Force, Cover Up After Shooting Man 76 Times, 11 ALIVE (Jan. 10, 2018),

https://www.11alive.com/article/news/local/lawrenceville/us-marshals-task-forceaccused-of-excessive-force-cover-up-after-shooting-man-76-times/85-506792680.

161.

The task force knew that Jamarion was schizophrenic and was not taking his medication. Id.

162.

When the task force attempted to arrest Jamarion, its members broke down the door of the apartment where he was located, entered the apartment, and began shooting their submachine guns and handguns at him. Id.

163.

Jamarion Robinson was ultimately shot 76 times. Id.

164.

In an ensuing cover-up, members of the task force claimed that Jamarion Robinson engaged in a shootout with officers. Id.

165.

In truth, however, Robinson was unarmed when they shot him 76 times. Id. Atlanta Police Officer William Sauls was not disciplined for his involvement in Jamarion's death and remained with the Atlanta Police Department, where he would continue to use excessive force. Id.

**Saleem Wilson Incident**

166.

On December 22, 2018, Officers Ian Mayfield and Virginia Pena Barrientos approached Saleem Wilson and another man in a McDonald's dining room. See Janice Yu, Atlanta Man Files Lawsuit Against APD and Officer Following 2018 Shooting, FOX 5 ATLANTA (June 24, 2020), https://www.fox5atlanta.com/news/atlanta-man-files-lawsuit-against-apd-andofficer-following-2018-shooting.

167.

Officers Mayfield and Barrientos confiscated guns that were among the possessions of Saleem Wilson and the third party. Both men were then unarmed. Id.

168.

Upon having his gun confiscated, Saleem Wilson got up and began to run from the Officers, at which point he was simultaneously tased by

Officer Barrientos and shot in the back of his neck by Officer Mayfield with the third party's gun (not his department-issued firearm). Id.

169.

After the shooting, Officers Mayfield and Barrientos lied about the circumstances leading up to the shooting. Id.

170.

Officer Mayfield reported that Saleem shot himself with his own gun while Officer Barrientos's statement did not mention seeing Officer Mayfield pursuing Saleem with a gun in his hand or hearing a gunshot. Id.

171.

APD declined to engage in, and or, engaged in inadequate remedial steps regarding this incident. Both officers remained employed with the Atlanta Police Department, even though the Fulton County District Attorney's Office investigated the incident for possible criminal charges. Id.

**Jimmy Atchison Incident**

172.

On January 22, 2019, Officer Sung Kim was serving as part of a federal task force that was attempting to arrest Jimmy Atchison. See

Christian Boone, New Details About FBI Task Force Shooting of Unarmed Man, AJC (Oct. 29, 2019),

https://www.ajc.com/news/crime--law/new-details-about-fbi-task-forceshooting-unarmed-man/udjLPncbiB4ISAEcIvybSN/.

173.

When the task force attempted to arrest Atchison, he fled the original location where he encountered law enforcement and hid in the closet of a friend's apartment. Id.

174.

When officers found Atchison, he was unarmed and emerged from the closet with his hands up, at which point Officer Sung Kim shot Jimmy Atchison in the face, killing him. Id.

175.

APD declined to engage in, and or, engaged in inadequate remedial steps regarding this incident. As is routine practice by APD, Officer Kim was allowed to retire in lieu of termination. See Raisa Habersham, Atlanta Cop Retires After New Details Emerge in FBI Task Force Shooting, AJC (Nov. 1, 2019),

https://www.ajc.com/news/local/atlanta-cop-retires-after-new-details-emerge-fbitask-force-shooting/HneBGNgnBKhDdUp26FuNCL/.

**Prior Incidents Involving Shooter of Rayshard Brooks, Officer Rolfe – Jackie Harris Incident**

176.

Before killing Rayshard Brooks on the night of June 12, 2020 as described above, Officer Rolfe unlawfully used his firearm under circumstances which did not authorize the use of deadly force.

177.

Officer Rolfe unlawfully used his firearm against Jackie Harris by shooting Harris in the back on August 2015 while Mr. Harris was not posing an immediate threat to authorize the use of deadly force

178.

None of the initial incident reports prepared by the involved officers reflected that Mr. Harris had been shot or seriously injured.

179.

After he was released from the hospital, Mr. Harris filed several complaints with APD against all three officers alleging that they used excessive deadly force by shooting him.

180.

APD failed to make any disciplinary findings or even complete an investigation into Mr. Harris' complaints against Officers Rolfe, Harp, and Castro alleging that they used unlawful deadly excessive force by shooting him.

181.

Officer Rolfe's Disciplinary Record as it pertains to the Harris incident reflects that said complaint remained unresolved.

182.

On May 10, 2016, Mr. Harris appeared before the Honorable Doris L. Downs in the Fulton County Superior Court to enter a plea in State of Georgia v. Jackie Harris, Indictment No. l5SCl37198.

183.

Based on the incident report and evidence presented to the Court at or before the plea hearing on May 10, 2016, the Court publicly chastised each of the three officers – Officers Rolfe, Harp, and Castro – in open court for their misconduct in failing to include in their reports that they used their firearms and shot Mr. Harris:

AND THE KICKER IS THAT THE POLICE —— NONE OF THE POLICE PUT IN THE REPORT THAT THEY SHOT THE MAN, NONE OF THEM, AND THEY SENT HIM TO GRADY WITH COLLAPSED LUNGS AND EVERYTHING, AND THE REPORT DOESN'T MENTION IT. I AM ETHICALLY GOING TO BE REQUIRED TO TURN ALL OF THEM IN. . . . I MEAN TO THE POLICE, AN INVESTIGATION. I MEAN, SOMEBODY NEEDS TO LOOK INTO THIS. THIS IS VERY STRANGE. WELL, TO ME YOU COULD STUDY THIS CASE FOR THE REST OF YOUR LIFE. I INTEND TO TURN IT IN TO INTERNAL INVESTIGATION OF SOME KIND, OR THE GBI. I THINK IT'S THE WILDEST CASE I'VE EVER SEEN IN MY 34 YEARS HERE.

184.

Despite the matter being referred for investigation by the Court, the City of Atlanta took no investigatory or disciplinary action against Officers Rolfe, Harp, or Castro in connection with the Harris incident, whether related to their unlawful use of deadly force or their failure to accurately report the same in their incident reports.

185.

Had APD properly investigated Officer Rolfe's improper use of a firearm in using deadly force against Mr. Harris, it would have concluded that deadly force was not authorized under the circumstances presented and that Rolfe's use of deadly force was excessive and violated Mr. Harris' constitutional rights as well as APD policy.

**Prior Incidents Involving Shooter of Rayshard Brooks, Officer Rolfe – Antraveious Payne Incident**

186.

On September 15, 2016, Officer Rolfe was involved in another incident involving the improper use of his firearm wherein Rolfe retrieved and pointed his gun against Antraveious Payne under circumstances which did not authorize the use of deadly force.

187.

The Payne incident is described more fully below and involved the unconstitutional and criminal use of force by a second Atlanta police officer.

188.

APD sustained the firearms violation against Rolfe and concluded that by retrieving his firearm and pointing it at a suspect in circumstances which did not authorize the use of deadly force, Officer Rolfe improperly "used" his firearm in violation of APD policy.

189.

Officer Rolfe's Disciplinary History record as it pertains to the Payne incident reflects that APD sustained a violation for improper use of

firearms against Officer Rolfe, and issued a written reprimand for a Category "A" violation:

Pursuant to APD policy, sustained policy violations are categorized into four different categories ranging from A to D, with the severity of misconduct and mandatory disciplinary action progressively increasing – "Category 'A' infractions represent the least egregious kind of misconduct while categories 'B,' 'C,' and 'D' represent progressively more serious types of misconduct." APD SOP 2020 4.4.1.

Category "A" violations are only reserved for minor rule violations such as work appearance, tardiness, and failing to appear for court which do not include improper use of a firearm.

A sustained finding that an officer improperly used a firearm is not a minor rule violation and is at a minimum a Category "B" violation.

190.

On July 25, 2017, Officer Rolfe's supervisor completed his Disciplinary Worksheet and properly categorized his improper use of a firearm as a Category "B" violation.

191.

Officer Rolfe's Category "B" violation for improper use of his firearm in connection with the Payne incident occurred within the reckoning period of the Harris incident wherein he likewise improperly used his firearm.

A Category "B" violation "occurring within the reckoning period of a same, similar or related past violation is increased another category level." APD SOP 2020 4.4.3.

192.

At a minimum, Officer Rolfe's sustained Category B violation for improper use of a firearm in connection with the Payne incident should have been increased to Category C with a mandatory discipline range of a 4-15 day suspension and/or demotion. APD SOP 2020 4.4.4.

193.

Without explanation, APD did not increase Officer Rolfe's sustained Category B violation to a Category C as required by mandatory policy, and instead improperly decreased it to a Category A violation on or about October 5, 2017 for which he only received a written reprimand.

194.

On June 29, 2025, after being reinstated to APD following the Brooks killing, Officer Rolfee - off duty at the time - was arrested for his involvement in a fight inside a Midtown Atlanta bar.

https://www.11alive.com/article/news/crime/garrett-rolfe-arrested-for-assault/85-d45fbd50-fcf2-4e6f-81d5-b974e1425fac

## CITY & APD'S PRACTICE OF IGNORING FALSE JUSTIFICATIONS OR COVERUPS CONCERNING THE USE OF FORCE

195.

The City of Atlanta Police Department has a custom and practice of accepting false versions of police officers concerning its officers' use of physical force. The City and APD allowed Officer Potter to continue using its firearm despite knowing of Potter's deception in reporting and in official interview.

196.

The effect of this practice resulted in the death of ANDERSON as APD and the City ignored and accepted previous false justifications for Officer Potter's unlawful uses of force.

197.

APD supervisory notes state Officer Potter's version of what happened in his domestic abuse incident included deception yet APD ignored Officer Potter's conduct and allowed Officer Potter to escape accountability.

198.

The City of Atlanta, by and through the recurrent practices of its police officers, including those charged with the investigation of civilian complaints of police abuse, has a custom and practice on the part of its offices as follows:

a. an officer commits an act of violence or an act of other breach of the constitutional rights of a civilian;

b. said officer falsely reports that they did not engage in the act of violence nor any other act constituting a breach of the constitutional rights of a civilian;

c. both the officer, along with and those officers designated to supervise that officer or to investigate the conduct of the officer, accept the officer's false statement concerning their conduct towards the civilian and either refuse or fail to even report the physical misconduct or, if they report that an incident occurred, they adopt the officer's false version of events despite immediately available evidence contradicting the officer's false version.

199.

By way of example, APD failed to conduct meaningful investigations of the following complaints wherein multiple officers were alleged to use gratuitous, excessive force without justification:

**Tyrone Carnegay Incident**

200.

In October 2014, Officer Trevor King was off-duty and working security at a Walmart store when he attempted to detain Tyrone Carnegay, who he believed to be shoplifting a tomato. See Ex-Atlanta Cop Gets 5 Years for Beating Walmart Customer Over 'Stolen' Tomato, AJC (May 8, 2018),

https://www.ajc.com/news/crime--law/atlanta-cop-gets-years-for-beating-walmartcustomer-over-stolen-tomato/jSnD2Crf5H94c9WjeU5p9I/.

201.

When Tyrone Carnegay attempted to exit the store, Officer King struck him seven times with a metal baton, breaking two bones in his legs (including a severe a compound fracture). Id.

202.

Incredibly, Officer King then arrested his victim and charged him with obstructing a police investigation and assaulting a police officer. Id.

203.

Officer King lied in the police report that he filed following the incident and indicated that Tyrone Carnegay reached for a gun. Id.

204.

Surveillance footage revealed that these claims were not true, and Officer King was federally charged with using unreasonable force and falsifying a police report. Id.

205.

Despite the shocking conduct and criminal charges, Officer King was not fired from the APD. Instead, he was permitted to retire. Id.

206.

As a result of APD permitting King to "retire" rather than be terminated, King was able to keep retirement benefits and APD was able to avoid tacitly acknowledging that its employee engaged in wrongful conduct.

207.

Officer King was nonetheless ultimately convicted on federal charges and sentenced to five years in prison. Id.

**Karla Weems Incident**

208.

Karla Weems informed APD that on June 28, 2011, 4 APD officers from the Fugitive Unit broke through the front door of her home,

handcuffed all occupants, and searched her home without a warrant. One of the handcuffed occupants, Mike Gibbs, informed APD that an officer dragged him outside and threw him to the ground, face-first, after he was handcuffed and not resisting.

209.

Another occupant, Rontavious Loyal, informed APD that another officer kicked him and threw him to the ground outside. The officers released all occupants after determining that the subject of their search was not present. APD's investigation was inadequate and any investigation was closed without confirming or denying whether the allegations of excessive force were true.

**Ezoeke Parks Incident**

210.

Ezoeke Parks informed APD that on August 23, 2011, 2 APD Officers – Officer Jose Vidal and Officer Norattam Holden - beat her and her daughter, informing APD that: (i) Officer Vidal kicked her in her stomach, dragged and pulled her by her hair, and kneed her in her back during her arrest; and (ii) that Officer Holden grabbed her 14-year old daughter by her neck and kneed her in her stomach.

211.

The ACRB concluded that there was sufficient evidence to sustain the citizen's allegations of excessive force against both officers and recommended to APD that the officers be suspended and undergo psychological evaluation.

212.

APD rejected the ACRB's recommendation, and instead concluded that there was insufficient evidence to sustain the allegations of excessive force against either officers without subjecting anyone to a CVSD. More specifically, APD explicitly concluded that pulling the citizen's hair was a reasonable "method to ensure that she was handcuffed." APD did not investigate or discipline either officer for failing to intervene in the other's use of excessive force.

**Bailey Cato Incident**

213.

Bailey Cato informed APD that on September 14, 2014, 2 APD officers – Officer Michael Soprano and Officer Matthew Johns - pepper-sprayed him and repeatedly punched him in the face and beat him without

provocation. APD and the Chief rejected the ACRB's finding that the allegation that these 2 APD officers used excessive force and rejected ACRB's recommendation that the officers be suspended and receive additional training, and did not impose any discipline on the officers for their use of excessive force. Moreover, APD did not investigate or discipline either officer for failing to intervene in the other's use of excessive force.

**Richard Williams Incident**

214.

Richard Williams informed APD that on March 31, 2015, after several APD officers in the Fugitive Unit stormed into his motel room to arrest him, an unidentified APD officer struck him in the head with a silver revolver while he was not resisting arrest. Despite confirming that the arrestee sustained a gaping two-inch headwound during his arrest which required treatment at the hospital, none of the officers present during the arrest could explain how Williams sustained said injury and provided conflicting accounts of the events that occurred during the arrest. APD did not subject any officers to CVSDs and instead closed its investigation

without confirming or denying whether the allegation of excessive force was true.

**Dr. Jay Berger Incident**

215.

On the evening of August 25, 2012, Dr. Jay Berger was arrested by Officer Lawrence of the City of Atlanta Police; Mr. Berger filed a complaint with the City alleging that the officer struck his knee with such force that it tore his ACL and caused other bodily harm during his arrest, ultimately requiring hospitalization and surgery; the City and APD blindly accepted the officer's unsupported denials of wrongdoing and denial of knowledge of any force being used on Berger's knee, despite the absence of any explanation as to how Berger sustained a documented serious knee injury during arrest; the City and APD continued to accept the officer's denial of the use of any force upon Berger even after a civil trial in federal court resulted in a verdict in favor of Berger finding that Officer Lawrence had used excessive force against Berger.

**Randal Brooks Incident**

216.

In March of 2010, Randal Brooks was arrested and tackled to the ground by Officers Alexander and Murden of the City of Atlanta Police Department.

217.

Before being tackled he was uninjured and fully able to walk. Once taken to the ground, Randal Brooks was on his stomach and the two officers forced their knees into his spine and neck area.

218.

During his arrest, Randal Brooks' spine was fractured and he was paralyzed as a result of physical force applied directly to his spine.

219.

The nature of his spinal injury was documented to be consistent with a knee having been positioned onto his spine, accompanied with a significant amount of force applied to his spine. There was no other available explanation for just how Randal Brooks' spine was fractured.

220.

Brooks remained paralyzed from the neck down throughout the remainder of his life; he died in 2012.

221.

Each of the officers at the scene of Randal Brooks' arrest claimed that they did not apply, nor did they see any other officer apply, any force to Brooks' cervical spine. Despite the catastrophic nature of the injury, the officers repeated their claims to superior officers who merely accepted their story. The City of Atlanta and APD continued to accept the officers' denial of the use of force upon Randal Brooks both before and after settlement of Randal Brooks' Estate's claim.

**Jerry Blasingame Incident**

222.

On July 10, 2018, APD Officer J. Grubbs tasered Jerry Blasingame for standing by a guard rail after Blasingame was seen panhandling.

223.

Officer Grubbs tasered Blasingame from behind close by to an uneven surface causing Blasingame to fall from a dangerous height and be paralyzed.

224.

The City and APD did not make a thorough enough investigation into Officer Grubbs' conduct and let him return to full duty six months after the incident and before the investigation was concluded.

**Robert Doe Incident**

225.

Another example of this custom and practice involves Robert Doe. The last name is withheld because the victim of the officer's force was a minor at the time. In December of 2019, Robert Doe's legs were shattered by the reckless use of force by Atlanta Police Officer Erik Clanton.

226.

Robert Doe was alleged to be selling water bottles to passing motorists when he was approached by Clanton and another officer in mid-town Atlanta.

227.

Fearful of police officers, Robert Doe ran away.

228.

Robert Doe reached and scaled a fence. As Robert Doe reached the other side of the fence, below which was a 20-30 foot drop to a highway, Officer Clanton forcefully ran into the fence—twice—causing Robert Doe to lose his grip on the fence and causing him to fall. The fall shattered his legs and caused a broken shoulder and facial fractures.

229.

Officer Clanton falsely reported that, rather than causing Robert's fall, he had "attempted to reach for" Robert to pull him down from the fence.

230.

Despite the availability of graphic video evidence contrary to Clanton's report, The City of Atlanta accepted Officer Clanton's false denial of use of force on Robert.

**Antraveious Payne Incident**

231.

On September 16, 2016, APD Officer Matthew Johns was involved in a police chase and was pursuing a vehicle in which Antraveious Payne, a teenager, was an occupant. See Asia Simone Burns, Ex-Atlanta Officer Sentenced to 5 Years in Prison After Kicking, Choking Teen (Aug. 26, 2019), https://www.ajc.com/news/crime--law/atlanta-officer-sentenced-years-prison-afterkicking-choking-teen/uRKXtUia2i7g7qHuNEfTcM/.

232.

After the police chase ended, Antraveious Payne exited the vehicle and laid on the ground with his hands up; he was unarmed and obviously surrendered. Id.

233.

Nonetheless, Officer Johns ran up to Antraveious Payne, kicked him in the head three times, and pressed his knee on the teenager's neck until he was unconscious. Id.

234.

Officer Johns lied about the circumstances leading up to his use of force and repeated these assertions in written statements to cover-up the excessive nature of the force that he used. Id.

235.

Officer Johns was fired by the APD for his use of force against Antraveious Payne and was indicted on criminal charges. Id.

236.

Officer Johns ultimately pleaded guilty to three counts of aggravated assault, one count of aggravated assault/strangulation, two counts of making a false statement, and two counts of violating his oath of office. Id.

237.

Officer Johns received a twenty-year sentence including five years in prison. Id.

**Messiah Young and Teniyah Pilgrim Incident**

238.

On May 30, 2020, six APD Officers—Officer Ivory Streeter, Officer Mark Gardner, Officer Lonnie Hood, Officer Armon Jones, Officer Willie Sauls, and Officer Roland Claud—engaged in the use of excessive force against two college students that were leaving a protest against police brutality. See Phil Helsel & Austin Mullen, 2 More Atlanta Police Officers Fired Over Use of Force During Protest, NBC NEWS (June 10, 2020),

https://www.nbcnews.com/news/us-news/2-more-atlanta-police-officers-firedover-use-force-during-n1229656.

239.

Messiah Young and Teniyah Pilgrim were driving down the road when they were stopped by officers who were enforcing a curfew that was issued by Mayor Keisha Lance Bottoms. Id.

240.

Without giving the students any time to respond to their commands, the officers broke the driver's side window with a baton, tased them both, and took them into police custody. Id.

241.

The incident was broadcast live on television, prompting a quick response from the City of Atlanta and the Atlanta Police Department. Id.

242.

All six officers were charged with crimes for their roles in the incident, including charges of aggravated assault, aggravated battery, and criminal damage to property. Id.

243.

Officers Streeter and Gardner were fired the day after the incident while Officers Hood and Jones were fired around a month later. Id.

244.

Officers Sauls and Claud remain employed with the City of Atlanta and APD despite the criminal charges that are pending against them for aggravated assault (Officer Sauls) and criminal damage to property (both officers).

245.

Alarmingly, Officer Sauls has been involved in three fatal shootings of unarmed men, yet still remains employed with the Atlanta Police Department. See Brad Schrade & Jennifer Peebles, APD Cop in Tasing Incident Faced Earlier Excessive Force Allegations, AJC (June 4, 2020), https://www.ajc.com/news/crime--law/apd-cop-tasing-incident-faced-earlierexcessive-force-allegations/9ajNXyELh8hWweqNF8Yh9J/.

246.

The prevalence of other incidents reinforces the City's and APD's need to train its officers.

247.

Each of the following cases involves the use of deadly force against an unarmed subject.

a. In October 2015, Atlanta sustained firearms use violation by Officer Emanuel Thompson because the suspect did not pose a serious threat of injury, without reference to immediacy or seriousness of physical threat. The City did not terminate or discipline officer; allowed him to resign a year after the shooting.

b. In December 2017, Altman Hall was shot by an APD officer while standing in a door way while, unarmed, during a standoff without.

c. In February 2018, an APD officer shot a person who fled after officers arrived based on a "suspicious person" report.

d. In May 2018, an officer discharged his weapon at two juvenile suspects who were fleeing police.

e. In June 2018, an APD Officer shot a citizen after first pepper spraying and tasing him.

f. In January 2019, a plain clothes APD officer shot at a suspect who was driving away from a gas station but who posed no other direct threat to the officer or the public.

g. In March 2019, Officer Marquee Kelley shot and killed a fleeing suspect.

248.

Inadequate training and supervision by the Chief, the City, and APD led to the above incidents and led to and encouraged and resulted in the incident in this case

# LEGAL CLAIMS

## FEDERAL

### Count I

### Excessive Force under 42 U.S.C. § 1983 & Battery per O.C.G.A. § 51-1-13 Against Officer Potter

249.

Plaintiffs hereby incorporate by reference and re-allege the preceding paragraphs of the instant Complaint as if fully set forth herein verbatim.

250.

When Officer Potter shot and killed ANDERSON, ANDERSON did not pose an immediate threat of serious physical harm or death to other persons and, as a result, Officer Potter's use of deadly force was unjustified and constituted a violation of the Fourth Amendment of the United States Constitution.

251.

Based on the totality of facts and circumstances described herein, no reasonable officer could have believed that ANDERSON posed any immediate threat of serious physical harm or death to any person while he was attempting to de-escalate an argument Officer Potter caused.

252.

Every reasonable officer would have known that the force used by Officer Potter was unreasonably disproportionate and excessive and would violate ANDERSON's Fourth Amendment rights.

253.

Officer Potter violated clearly established law and is not entitled to qualified immunity for his use of deadly force in shooting ANDERSON. Officer Potter's use of force against ANDERSON after all ANDERSON attempted to do was defuse / de-escalate / calm an argument constituted an assault and battery upon ANDERSON.

254.

By virtue of the facts described herein, the actions of Officer Potter constitute assault and battery under Georgia law; a violation of Article I, Paragraph XIII of the Constitution of the State of Georgia; and abuse in being arrested in violation of Article I, Paragraph XVII of the Constitution of the State of Georgia.

255.

Officer Potter acted with actual malice and an intent to injure ANDERSON by using deadly and excessive force such that he is not entitled to official immunity under state law.

256.

As a result of Officer Potter's unlawful conduct, Plaintiff sustained injuries and pain in advance of his death, and sustained injuries which caused ANDERSON's death.

**Count II**

**Ministerial Duty Violation Against Officer Potter and City of Atlanta**

257.

Plaintiffs hereby incorporate by reference and re-allege the preceding paragraphs of the instant Complaint as if fully set forth herein verbatim.

258.

Officers are required to obey the law. The Law Enforcement Officers Safety Act (LEOSA) prohibits the use of alcohol or other intoxicating substances while carrying a firearm.

259.

A municipal corporation shall be liable for neglect to perform or improper performance of ministerial duties, O.C.G.A. § 36-33-1(b).

260.

Atlanta Police Department Standard Operating Procedure 2010 Work Rules Section 4.2.47 states, with regard to Off-Duty Situations "Employees will take appropriate and necessary action when off duty in any situation where a felony is being committed or human life is endangered. Employees will turn the situation over to on-duty public safety employees as soon as possible." 4.2.49 regards "Abuse of Authority" and states "Employees will not use their authority to abuse, harass, oppress, or persecute any person." Section 4.2.50, "Mistreatment or Unnecessary Force" expressly prohibits unnecessary or unreasonable force". Section 4.2.54 regards "Situations Involving Off-Duty Employees" and provides "Employees confronted with a situation requiring public safety intervention or action in which an off-duty employee is involved will not intervene, except to meet an emergency that exists. As soon as possible, the

employee will notify Communications and request that a supervisor or OPS respond to the scene."

261.

Officer Potter abused, harassed, and persecuted Mr. Anderson and endangered human life yet did not turn the situation over to on-duty public safety employee; Officer Potter mistreated and used unnecessary force on Mr. Anderson; Officer Potter did the opposite of assisting the public, Potter created an unsafe situation; Officer Potter did not notify Communications to request a supervisor or OPS to respond to the scene. Also as stated, Officer Potter violated the Law Enforcement Officers Safety Act (LEOSA) which prohibits the use of alcohol or other intoxicating substances while carrying a firearm. Officer Potter violated LEOSA during his DUI arrest also. These are simple rules that require no discretion.

262.

Where there is an established policy requiring an official to take specified action in a specified situation, the policy creates a ministerial duty on the part of the official to perform the specified task. See Happoldt v. Kutscher, 256 Ga.App. 96(1), 567 S.E.2d 380 (2002). See also Standard v. Hobbs, 263 Ga.App. 873(1), 589 S.E.2d 634 (2003) ("when `a governmental

department creates its own policy requiring certain actions under certain situations, then the actors for that department have a ministerial duty to follow the policy.'"). In order for the written policy to impose a ministerial duty, the policy must mandate simple, absolute, and definite action and require the execution of a specific task without any exercise of discretion. McDowell v. Smith, 285 Ga. at 593-594, 678 S.E.2d 922. In the following cases, written policies were ruled to require ministerial acts because the policy clearly set out the factual situation that required the ministerial act and gave the public official no discretion. See id. (when a phone call or facsimile transmission requests the early release of a child from school, the written policy requires the school employee to follow certain procedures to authorize the child's release); Meagher v. Quick, 264 Ga.App. 639, 643, 594 S.E.2d 182 (when a police officer responds to a call reporting suspected family violence, the written policy (OCGA § 17-4-20.1(c)) requires the officer to complete a written family violence report); Nelson v. Spalding County, 249 Ga. at 336, 290 S.E.2d 915 (when a traffic sign is in need of placement or replacement, the written policy requires Nelson to do so upon being notified of the need); Wanless v. Tatum, 244 Ga.App. 882, 884, 536 S.E.2d 308 (2000) (when a citizen lodges a complaint, the written policy

requires the employee receiving the complaint to make a written record of it and for the complaint to be investigated); Lincoln County v. Edmond, 231 Ga.App. 871(2), 501 S.E.2d 38 (1998) (when a downed tree is a roadway obstruction, the county's policy requires that warnings of the downed tree's presence be erected and the tree removed).

263.

Officer Potter violated simple, absolute, and definite rules that arise under conditions requiring merely the execution of a specific duty that requires no discretion.

264.

The policies and procedures of the City of Atlanta Police Department which direct that officers not drink and use their service weapon constitutes a ministerial duty. Section 4.2.54 regards “Situations Involving Off-Duty Employees” and provides “Employees confronted with a situation requiring public safety intervention or action in which an off-duty employee is involved will not intervene, except to meet an emergency that exists. As soon as possible, the employee will notify Communications and request that a supervisor or OPS respond to the scene.”

Officer Potter breached these simple, absolute, and definite ministerial duties through negligent or intentional conduct and, as result, the City of Atlanta is subject to liability to Plaintiffs for the injuries, death, pain caused ANDERSON during his last remaining moments of life, and the full value of DEVON ANDERSON's life (economic and intangible).

265.

The City of Atlanta is liable to Plaintiffs for the failure to perform ministerial duties.

**Count III**

**Municipal Liability under 42 U.S.C. § 1983 against the City of Atlanta, Chief Darin Schierbaum, Monell Claims**

266.

Plaintiffs hereby incorporate by reference and re-allege the preceding paragraphs of the instant Complaint as if fully set forth herein verbatim.

267.

At all relevant times herein, Defendant Schierbaum, as the Chief of Police, was the final policymaker for the City of Atlanta with final decision-making authority with regard to training, supervision, and discipline of officers employed by the City and the Atlanta Police Department ("APD"),

establishing and implementing the written policies and procedures governing APD police officers (Standard Operating Procedures), and managing, directing, and controlling the operations, disciplinary process, and administration of The Office of Professional Standards ("OPS") and the Department as a whole.

268.

At all times material herein, Defendant Darin Schierbaum was the Chief of Police for the City of Atlanta. In June 2022 Mayor Andre Dickens appointed Darin Schierbaum to serve as Interim Chief of Police following the retirement of Chief Rodney Bryant. Schierbaum was appointed to be the 26th Chief of the Atlanta Police Department by Mayor Dickens in October 2022.

269.

At all material times herein, the City's SOPs required APD officers to report each use of force to their immediate supervisors, and APD supervisors were required to respond to the scene, initially review the use of force, and prepare a Use of Force Report by the end of that shift.

270.

A meaningful, constitutionally adequate UOF investigation cannot be completed by an APD supervisor in one shift.

271.

APD supervisors were required to initiate a constitutionally adequate UOF investigation by forwarding the subordinate officer's use of force to OPS investigators to conduct a proper UOF investigation and determine whether the officer's use of force was lawful, justified, and in compliance with the SOPs.

272.

OPS investigators are required to thoroughly investigate all uses of force forwarded to them by an APD supervisor, as well as all citizen complaints, to ultimately determine whether the use of force was lawful, justified, and in compliance with the SOPs.

273.

At all material times herein, Defendant Chief Schierbaum had knowledge that APD officers throughout the department were routinely

using unjustified force against citizens with impunity and without consequences, and that these uses of force were routinely not being investigated in a meaningful or constitutionally adequate manner by APD supervisors and/or OPS investigators.

274.

Between 2017 and 2020, APD officers reported using non-deadly physical force on approximately 1,274 different occasions (excluding incidents only involving Force Entry or Firearms).

275.

Approximately 1,212 of those 1,274 reported Use of Force (UOF) incidents (95%) were rubber-stamped and approved by the officer's immediate supervisor without forwarding the same to OPS for a UOF investigation, and without any disciplinary action or remedial training imposed against the officer.

276.

Proper usage and analysis of the use of force incident reports may reveal patterns or trends that could indicate training needs, equipment upgrades, and/or policy modifications.

277.

With its rubber-stamping and almost rote approval by the officer's immediate supervisor without forwarding the same to OPS for UOF investigation, and without any disciplinary action or remedial training imposed against the officer, prevents a proper usage and analysis of the UOF reports to potentially reveal patterns or trends that could indicate training needs, equipment upgrades, and/or policy modifications.

278.

At all material times herein, Defendant Chief Schierbaum had knowledge that APD supervisors throughout the department were routinely rubber-stamping and approving of an officer's reported use of force without consideration of the objective *Graham* factors to determine whether the force used was objectively reasonable and proportionate to the

need for force in light of the totality of circumstances, including the severity of the crime at issue and the extent to which the suspect was actively resisting.

279.

At all material times herein, Defendant Chief Schierbaum had knowledge that APD supervisors throughout the department were routinely rubber-stamping and approving of gratuitous uses of force in clear violation of the Fourth Amendment.

280.

At all material times herein, Chief Schierbaum also had a pattern and practice of outsourcing supervision and discipline to the Office of the District Attorney. In many instances only if and when the District Attorney filed criminal charges against an officer did Chief Schierbaum determine an officer's conduct worthy of supervision discipline. In actuality an officer's conduct can violate rules and regulations and good policing standards without criminal charges.

281.

Furthermore the District Attorney's Office determination as to whether to file an indictment considers other issues aside from the violation of rules and regulations and good policing standards.

282.

As a matter of widespread and persistent pattern and practice, OPS investigators routinely failed to determine whether citizen complaints alleging the use of excessive force were true and routinely failed to determine whether the officer's use of force was lawful and in compliance with the SOPs.

283.

OPS investigators are authorized to make the following dispositions to close a UOF investigation:

a. EXONERATED - the conduct was determined to be justified, lawful and proper

b. NOT SUSTAINED - the investigation did not develop sufficient information to prove or disprove the allegation(s) stated in the complaint

with regard to employee work rule 4.2.50 (Maltreatment or Unnecessary Force).

c. SUSTAINED - the investigation did develop sufficient information to prove the allegation(s) stated in the complaint.

d. UNFOUNDED - the allegation(s) were without factual basis.

e. EXCEPTIONALLY CLOSED

As a matter of widespread and persistent pattern and practice, OPS investigators routinely closed UOF investigations with a final disposition of "NOT SUSTAINED" without making any determination as to whether the force was lawful or otherwise in compliance with the City's SOPs, and in each such case, APD took no further investigatory, disciplinary, or remedial action against the officer.

284.

A UOF investigation with a final disposition of "NOT SUSTAINED" is meaningless and confirms that in each such instance, OPS investigators failed to conduct a constitutionally adequate investigation and instead prematurely closed the investigation without proving or disproving the

UOF allegations against the officer, and without any determination as to whether the officer's use of force was lawful and proper or otherwise in compliance with APD's policies.

285.

When a UOF allegation is NOT SUSTAINED, Defendant Chief Schierbaum had knowledge that as a matter of widespread and persistent pattern and practice, APD did not impose any further disciplinary action, increased supervision, or remedial training on the officer.

286.

Defendant Chief Schierbaum had knowledge that APD treated a final disposition of "NOT SUSTAINED" the same as if the use of force had been determined by OPS to be lawful and proper.

287.

As a matter of official policy and widespread pattern and practice, Defendant Chief Schierbaum had knowledge that when preparing an officer's Disciplinary Worksheet in connection with any OPS UOF investigation APD supervisors and OPS investigators do not and are not

required to consider any prior UOF allegations that were "NOT SUSTAINED."

288.

As a matter of widespread and persistent pattern and practice, Defendant Chief Schierbaum had knowledge that OPS investigators routinely closed UOF investigations with a disposition of "NOT SUSTAINED," without making any effort to develop readily available information which would definitively prove or disprove the UOF allegation against the officer.

289.

For example, Defendant Chief Schierbaum had knowledge that OPS investigators routinely disposed of UOF allegations as "NOT SUSTAINED" without interviewing the complainant and/or other available civilian witnesses.

290.

Similarly, and as a matter of widespread and persistent pattern and practice, Defendant Chief Schierbaum had knowledge that OPS

investigators routinely failed to administer readily-available Computer Voice Stress Analysis ("CVSA") exams to officers in connection with UOF investigations which did not otherwise have available video footage or other evidence to resolve discrepancies between the victim's and the officer's conflicting version of events, and as a matter of widespread and persistent pattern and practice, instead prematurely closed those UOF investigations with a disposition of "NOT SUSTAINED".

291.

Defendant Chief Schierbaum had knowledge that in connection with UOF investigations which do not otherwise have available video footage or other evidence to resolve discrepancies between the victim's and the officer's conflicting version of events, the results of a CVSA exam would provide OPS investigators with objective data as to the veracity of each person's version of events and would prove or disprove the UOF allegations against the officer.

292.

In the rare circumstance wherein OPS investigators did choose to administer a CVSA exam to an officer during a UOF investigation,

Defendant Chief Schierbaum had knowledge that as a matter of widespread and persistent pattern and practice, OPS investigators routinely disregarded the results of CVSA exams which clearly indicated that the officer was lying and instead disposed of the UOF investigation as "NOT SUSTAINED".

293.

Officer Potter's own CVSA in relation to his victimization of his pregnant domestic partner in an episode of domestic violence is an example of this.

294.

In the rare circumstance wherein a UOF allegation is "SUSTAINED" against an officer, Defendant Chief Schierbaum had knowledge that as a matter of widespread and persistent pattern and practice, OPS investigators routinely violated the City's written disciplinary policies & SOPs and modified the mandatory minimum discipline to impose less severe discipline than required. For example, in connection with OPS File # 19-1-0026-UAF, OPS investigators "SUSTAINED" a serious UOF violation against an officer, a Category C-D violation which requires a minimum

mandatory 4 to 16 day suspension; in accordance with APD's widespread and persistent pattern and practice and in violation of the City's SOPs, APD modified the mandatory disciplinary action against the officer from a 4-day suspension to an unauthorized written reprimand, the least severe form of disciplinary action that can be imposed against an APD officer for even a minor Category A work rule violation.

295.

OPS routinely modified disciplinary action to impose less severe and unauthorized disciplinary action for a sustained UOF violation in several other instances in this same manner.

296.

Defendant Chief Schierbaum had knowledge that OPS investigators also routinely disposed of allegations of serious UOF violations by amending and investigating the same as a less serious and more obscure allegation of a minor work rule violation such as Work Rule 4.1.1 – Appropriate Action Required, which requires, in relevant part, that all employees "[p]erform[] official acts in a lawful, restrained, dignified, impartial, and reasonable manner", or Work Rule 4.2.33 – Conformance to

Directives, which requires that all employees "familiarize themselves with, and conform to, the rules, regulations, directives, and standard operating procedures of the Department."

297.

In addition, and by way of example only, APD failed to conduct meaningful investigations of the complaints alleged above wherein multiple officers were alleged to use gratuitous, excessive force without justification.

298.

Despite knowledge of the City's widespread and persistent pattern and practice of excessive force and failure to conduct meaningful UOF investigations, Defendant Chief Schierbaum turned a blind eye and took no remedial action.

299.

Defendant City of Atlanta's widespread and persistent pattern and practice of excessive force and failing to conduct meaningful UOF investigations was so widespread and persistent that it amounts to a

municipal policy of deliberate indifference and was the moving force behind Defendant Potter's use of excessive force against DEVON ANDERSON.

300.

Defendant City of Atlanta's widespread and persistent unconstitutional patterns and practices regarding the use of force instilled in Atlanta Police Officers the belief that they were permitted to use force against citizens with impunity and without any consequences.

301.

In connection with the subject incident, Defendant Potter was acting pursuant to the City's official policy, custom, and/or practice of using gratuitous excessive force without recourse, which was the moving force behind their brazen use of gratuitous, excessive force against DEVON ANDERSON.

302.

As a direct and proximate result of the City's unconstitutional conduct, DEVON ANDERSON suffered injuries and death. Additionally,

the Plaintiffs suffered damages for which Defendant City of Atlanta is liable under § 1983.

303.

The Chief's, the City's, and APD's insufficient oversight of use of deadly force incidents, unconstitutional policy, and inadequate training create an overwhelming risk that its officers will use deadly force when doing so is unconstitutional.

304.

The Chief, the City, and APD allowed a widespread pattern and practice of APD officers improperly using department-issued firearms and excessive deadly force in circumstances which do not authorize the use of deadly force and did so despite knowledge of the substantial risk that officers would violate the Constitution if this custom was allowed to continue uncorrected; the City and APD nevertheless took wholly inadequate remedial action and allowed the unconstitutional custom to continue.

305.

The frequency with which officers use deadly force in circumstances where force is unjustified reinforces the need for the Chief, the City, and APD to provide competent and thorough training on the circumstances which authorize the use of deadly force.

306.

In spite of knowledge that its officers fail to abide by City and APD policy when reporting their uses of force, and failure to report the use of deadly force, the Chief, the City, and APD have taken inadequate action.

307.

Despite knowing that its officers are repeatedly using deadly force in violation of the Fourth Amendment of the Constitution, the Chief, the City, and APD inadequately reacts and inadequately fails to take appropriate action.

308.

The Chief, the City, and APD's failure to train its officers, and specifically failure to both discipline and train Officer Potter, were the driving force behind Officer Potter's belief that deadly force was

authorized, and the driving force behind Officer Potter's decision to use deadly force against ANDERSON.

309.

The Chief, the City, and APD failed to supervise, discipline, investigate, train, and wrongfully entrusted, and retained Officer Potter despite multiple instances of highly concerning detrimental misconduct. To include, to wit:

a. With utter indifference and conscious disregard, City of Atlanta through Atlanta Police Department (APD), retained Officer Potter as an APD officer, even though it knew or should have known of Potter's dangerous propensities involving the use of his service weapon while utilizing his position as an officer under the color of law while on and off-duty, and that the allowance of such would cause and could cause injury to an individual such as Devon Anderson;

b. With utter indifference and conscious disregard, APD, allowed its officer, Potter, to carry his service weapon on his person while off-duty, even though APD knew or should have known of Potter's dangerous propensities involving the use of his service weapon while utilizing his position as an officer under the color of law while on and off-duty, and that the allowance of such would cause and could cause injury to an individual such as Devon Anderson;

c. With utter indifference and conscious disregard, APD allowed its officer, Potter, to display his service weapon on his person while off-duty, even though APD, knew or should have known of Potter's dangerous propensities involving the use of his service weapon while utilizing his

position as an officer under the color of law while on and off-duty, and that the allowance of such would cause and could cause injury to an individual such as Devon Anderson;

d. With utter indifference and conscious disregard, APD allowed its officer, Potter, to possess his service weapon on his person while off-duty, even though APD knew or should have known of Potter's dangerous propensities involving the use of his service weapon while utilizing his position as an officer under the color of law while on and off-duty, and that the allowance of such would cause and could cause injury to an individual such as Devon Anderson;

e. With utter indifference and conscious disregard, APD allowed its officer, Potter, to fire his service weapon while off-duty, even though APD knew or should have known of Potter's dangerous propensities involving the use of his service weapon while utilizing his position as an officer under the color of law while on and off-duty, and that the allowance of such would cause and could cause injury to an individual such as Devon Anderson;

f. With utter indifference and conscious disregard, APD failed to properly train its officer Potter, with regards to the use of his service weapon while off-duty, even though APD knew or should have known of Potter's dangerous propensities involving the use of his service weapon while utilizing his position as an officer under the color of law while on and off-duty and that the failure of such would cause and could cause injury to an individual such as Devon Anderson;

g. With utter indifference and conscious disregard, APD failed to properly train its officer Potter, with regards to the storage of his service weapon, even though APD knew or should have known of Potter's dangerous propensities involving the use of his service weapon while utilizing his position as an officer under the color of law while on and off-duty and that the failure of such would cause and could cause injury to an individual such as Devon Anderson;

h. With utter indifference and conscious disregard, APD failed to supervise Potter, with regards to the storage of his service weapon, even though APD knew or should have known of Potter's dangerous propensities involving the use of his service weapon while utilizing his position as an officer under the color of law while on and off duty, and that the failure of such would cause and could cause injury to an individual such as Devon Anderson;

i. With utter indifference and conscious disregard, APD failed to discipline or reprimand Officer Potter, even though APD knew or should have known of Potter's dangerous propensities and acts committed from the complaints filed against him, and that the failure of such would cause and could cause injury to an individual such as Devon Anderson;

j. With utter indifference and conscious disregard, APD failed to terminate and/or separate Officer Potter from APD, even though APD knew or should have known of Potter's dangerous propensities and acts committed from complaints filed against him prior to this event and that the failure of such would cause and could cause injury to an individual such as Devon Anderson;

k. With utter indifference and conscious disregard, APD failed to uphold and sustain findings made by investigators into a domestic violence incident against Officer Potter by his then pregnant girlfriend, and knew or should have known that the failure of such action would cause and could cause injury to an individual such as Devon Anderson.

l. With utter indifference and conscious disregard, APD failed to arrest Officer Potter for domestic violence after a complaint was filed against him by his then pregnant girlfriend and after an investigation, and knew or should have known that the failure of such action would cause and could cause injury to an individual such as Devon Anderson.

m. With utter indifference and conscious disregard, APD failed to properly investigate numerous complaints filed against Potter, even though APD

knew or should have known of Potter's dangerous propensities and acts committed from the complaints filed against him, and that the failure of such would cause and could cause injury to an individual such as Devon Anderson;

n. With utter indifference and conscious disregard, APD failed to properly investigate criminal charges against Officer Potter, even though APD knew or should have known of inconsistencies in Potter's account of the circumstances;

o. With utter indifference and conscious disregard, APD failed to properly investigate complaints against Potter, including but not limited to: failure to properly document and process the scene; failure to treat, investigate, or question Officer Potter as a suspect; failure to take Officer Potter's substance testing in a proper time and fashion; failure to compile, search and test evidence;

p. With utter indifference and conscious disregard, APD failed to maintain and/or utilize a valid early warning system which would have identified Officer Potter as an officer with repeated offenses and complaints alleged against him, enabled proper discipline, re-training, supervising or other intervention into his behavior, and therefore prevented the shooting from occurring, even though APD knew or should have known that its system did not work and/or was not proper, and knowing that the failure of such would cause and could cause injury to an individual such as Devon Anderson;

q. Was otherwise willful and wanton.

**Count IV**

**Municipal Liability under 42 U.S.C. § 1983 against Chief Darin Schierbaum & the City of Atlanta - De Facto Canton Claims**

310.

Plaintiffs hereby incorporate by reference and re-allege the preceding paragraphs of the instant Complaint as if fully set forth herein verbatim.

311.

Chief Schierbaum, the City, and APD have a de facto policy, practice and/or custom of concealing and/or suppressing officer misconduct (both on duty and off duty misconduct), including the use of unlawful force. The concealment and suppression of the existence of misconduct includes, but is not limited to: failure to sufficiently investigate allegations of misconduct; failure to accept complaints from citizens against police officers; the failure to investigate criminal conduct where off or on duty officers are involved; the disparate treatment of an officer who is the subject of an investigation and a non-officer suspect; failure to promptly record witness statements or preserve evidence; failure to promptly interview the suspected officer; failure to properly and sufficiently discipline an officer, even where the complaint is sustained; fabrication of

exculpatory evidence or destruction of evidence; and failure to initiate prompt disciplinary procedures related to the alleged misconduct, even when the allegation of misconduct has obvious merit.

312.

APD has a de facto policy, practice and/or custom of defective and biased procedures for investigating complaints, including excessive force and domestic violence complaints (and violating Official Opinion 96-25 of the Office of the Attorney General of Georgia regarding the Lautenberg Amendment to the Gun Control Act of 1968, 18 U.S.C. § 921 et seq., which amendments were made part of the Omnibus Consolidated Appropriations Act of 1997 and its impact on O.C.G.A. § 35-8-7 and P.O.S.T. certification requiring that a person convicted of domestic violence surrender all firearms and ammunition, including that any affected law enforcement personnel who are required to carry firearms may be rendered unable to perform as peace officers, thus raising certification issues see https://law.georgia.gov/opinions/96-25 ), against on and off duty officers. This "double standard" regarding allegations of misconduct against off-duty officers includes, but is not limited to: all of the above acts and/or omissions listed in the paragraphs above; limiting charges against off-duty

officers, nullifying charges, minimizing criminality to misdemeanors (or taking measures to have the charges dismissed), regardless of the severity or outrageousness of the alleged misconduct; and suppressing felony review of charges against off-duty officers, regardless of the severity or outrageousness of the alleged misconduct.

313.

APD has a de facto policy, practice and/or custom of failing to maintain accurate and complete records of complaints and investigations of misconduct.

314.

APD has a de facto policy, practice and/or custom of failing to turn over and disclose complete records of complaints and investigations of misconduct.

315.

APD has a de facto policy, practice and/or custom of a "code of silence" (sometimes also referred to as the blue line or blue shield). This code is an implicit understanding between and among members of the APD resulting in a refusal or failure to report instances of misconduct of which they are aware, including the use of unlawful force, despite their

obligation to do so as sworn peace officers. This includes police officers who remain silent or give false or misleading information during official investigations into allegations of a fellow officer related to misconduct that occurred on duty or off duty in order to protect themselves or their fellow officers from discipline, criminal prosecution or civil liability.

316.

APD acted in a manner consistent with a de facto policy, practice and/or custom of a "code of silence" and "blue shield" when it engaged in conduct such as, but not limited to, failing to properly investigate and then supervise Officer Melvin's multiple instances of misconduct.

317.

The above described de facto policies, practices and/or customs of APD proximately result in the culture and endemic attitude among members of APD, including Officer Potter, that they may engage in misconduct against citizens with impunity, and without fear of official consequence; they consider themselves "above the law."

318.

The aforementioned de facto policies, practices and/or customs of APD, individually and collectively, have been maintained and/or

implemented with utter indifference by APD and has or have encouraged and/or motivated Officer Potter to commit the aforesaid wrongful acts against Devon Anderson, and therefore acted as the direct and proximate cause of the injuries sustained by the Plaintiff.

**Count V**

**Liability Against Officer Potter in his Official Capacity**
**Officer Potter acted with Actual Malice.**

319.

Plaintiffs hereby incorporate by reference and re-allege the preceding paragraphs of the instant Complaint as if fully set forth herein verbatim.

320.

Officer Potter is not entitled to official immunity, as he acted with actual malice or intent to injure Mr. Anderson. In the context of official immunity, actual malice requires a deliberate intention to do wrong, and denotes express malice or malice in fact. This definition is consistent with express malice which, in criminal law, is similarly defined as a deliberate intention to do an unlawful act.... Actual malice requires more than harboring bad feelings about another. While ill will may be an element of actual malice in many factual situations, its presence alone cannot pierce

official immunity; rather, ill will must also be combined with the intent to do something wrongful or illegal. See *Adams v. Hazelwood*, 271 Ga. 414, 414-15 (1999)). "In the context of a shooting by a police officer, the Supreme Court of Georgia has held that if the officer shot `intentionally and without justification, then [he] acted solely with the tortious actual intent to cause injury' and would not be protected by official immunity.'" *Porter v. Massarelli*, 303 Ga. App. 91, 96 (2010) (quoting Kidd v. Coates, 271 Ga. 33, 34 (1999)).

## STATE LAW TORT VIOLATIONS

### Count VI

### Aggravated Assault and Aggravated Battery

321.

Plaintiffs hereby incorporate by reference and re-allege the preceding paragraphs of the instant Complaint as if fully set forth herein verbatim.

322.

A police officer commits a battery when he or she uses any force, even touching the plaintiff, during the course of an unlawful detention. Thus, while "not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers violates the Fourth

Amendment," *Graham v. Connor*, 490 U.S. at 386, 397 (1989), force that otherwise may be deemed relatively de minimis may be deemed excessive if the circumstances do not warrant any use of force. See, e.g., *Mejia v. City of New York*, 119 F. Supp. 2d 232, 282 (E.D.N.Y. 2000) [noting that where police officers "manufactured" evidence on which they alleged probable cause, "any use of force would be objectively unreasonable under the circumstances"]. The circumstances here did not warrant the use of any force. Mr. Anderson was unlawfully seized. Therefore shooting Mr. Anderson was an aggravated assault and battery.

**Count VII**

**Intentional Infliction of Emotional Distress**

323.

Plaintiffs hereby incorporate by reference and re-allege the preceding paragraphs of the instant Complaint as if fully set forth herein verbatim.

324.

Under Georgia law, the tort of intentional infliction of emotional distress exists when a defendant intentionally or recklessly, through conduct that is extreme and outrageous, causes severe emotional distress to a plaintiff. *Moses v. Prudential Ins. Co.*, 187 Ga.App. 222, 224-25, 369 S.E.2d

541 (1988). Conduct is extreme and outrageous and sufficient to support a claim for intentional infliction of emotional distress if "the citation of the facts to an average member of the community would arouse his resentment against the actor, and leave him to exclaim `outrageous!'" *Yarbray v. Southern Bell Tel. and Tel. Co.*, 261 Ga. 703, 706, 409 S.E.2d 835 (1991) (citing Restatement (2d) of Torts § 461(1) (1965)). Officer Potter's conduct clearly qualifies.

**Count VIII**

**Gross Negligence**

325.

Plaintiffs hereby incorporate by reference and re-allege the preceding paragraphs of the instant Complaint as if fully set forth herein verbatim.

326.

A wrongdoer is guilty of gross negligence or acts wantonly and willfully when he inflicts injury in such a way that is so utterly indifferent to the rights of others that he acts as if such rights did not exist. The unjustified shooting of Mr. Anderson is wanton and willful gross misconduct and negligence for which Punitive Damages are recoverable.

**Count IX**

**State Law Vicarious Liability Claim Under Respondeat Superior**

327.

Plaintiffs hereby incorporate by reference and re-allege the preceding paragraphs of the instant Complaint as if fully set forth herein verbatim.

328.

City of Atlanta's indemnification of APD constitutes a limited waiver of sovereign immunity, so the City may be sued for Officer Potter's violations of state law pursuant to respondeat superior. See *Gilbert v. Richardson*, 264 Ga. 744, 452 S.E.2d 476, 482 (1994) ("when a city purchases liability insurance, it waives immunity to the extent of [such] liability coverage").

**Count X**

**Conspiracy Claim Against All Defendants Including Lakeshia Riley**

329.

Plaintiffs hereby incorporate by reference and re-allege the preceding paragraphs of the instant Complaint as if fully set forth herein verbatim.

330.

According to O.C.G.A. § 51-12-30 - Procurer of wrong as joint wrongdoer, "In all cases, a person who maliciously procures an injury to be

done to another, whether an actionable wrong or a breach of contract, is a joint wrongdoer and may be subject to an action either alone or jointly with the person who actually committed the injury."

**Count XI**

**Wrongful Death Against All Defendants**

331.

As a direct, sole, and/or proximate cause of actions by Defendants, as described above, the Plaintiffs are entitled to recover any and all damages resulting from the wrongful death of DEVON ANDERSON, including but not limited to, the full value of DEVON ANDERSON's life, including economic damages, non-economic damages, and the loss of the enjoyment of living.

**Count XII**

**Estate Claims Against All Defendants**

332.

As a direct, sole, and/or proximate cause of actions by Defendants, as described above, the Plaintiffs are entitled to recover any and all damages resulting from DEVON ANDERSON's conscious pre-death pain and

suffering, shock and fright, anxiety, funeral and burial expenses, and last expenses.

**PRAYER FOR RELIEF**

Plaintiffs respectfully request:

a. That the Estate of ANDERSON be awarded damages from the Defendants for the pain and suffering of ANDERSON prior to his death and be awarded all damages, including special, nominal, punitive, and compensatory damages permitted by operation of federal and Georgia law. The Estate does not seek punitive damages against the City of Atlanta.

b. That Valerine Lans Anderson be awarded judgment against Defendants for all damages permitted by law for the wrongful death of ANDERSON including compensatory damages as measured by the full value of ANDERSON's life and punitive damages. Ms. Anderson does not seek punitive damages against the City of Atlanta.

c. That Plaintiffs recover attorney's fees pursuant to 42 U.S.C. § 1988;

d. That a trial by jury be had upon all issues so triable; and,

e. That Plaintiffs be awarded such other and further relief to which they are legally entitled.

Respectfully submitted this 21st day of October, 2025.

**ERIC J. HERTZ, PC**

***/s/ Jeffrey E. Gewirtz***
Jeffrey E. Gewirtz
GA State Bar No. 292434
*jeff@hertz-law.com*
8300 Dunwoody Pl. Suite 210
Atlanta, GA 30350
*Counsel for Plaintiff*